UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
UNITED STATES OF AMERICA,

– against –                                                                                     No. 22-cr-150-04 (JPC)

EDWIN ACEVEDO JR.,

                              Defendant.
------------------------------------------------------------------------x

**SENTENCING MEMORANDUM OF DEFENDANT  EDWIN ACEVEDO JR.**

LAW OFFICE OF EVAN L. LIPTON, P.C.
***Counsel for Edwin Acevedo Jr.***
250 West 55th Street, Floor 30
New York, New York 10019
ell@evanliptonlaw.com
(917) 924-9800

**Table of Contents**

I.     Introduction………………………………………………………………….1

II.    Edwin sold drugs to feed his disease, not to profit from the
       illicit economy…………………………………………………..………….5

       A.    Edwin was born an opioid addict…………………………………..….5

       B.    Edwin was abused and neglected by his parents and
             guardians; he was never provided with the tools to overcome
             trauma……………………………………………………………………7

       C.    Edwin became addicted to heroin when he was incarcerated at
             Rikers Island at seventeen years old and has remained addicted his
             entire adult life……………………………………………………....…9

IV.    Edwin needs treatment, not incarceration………………………………….12

V.     A lengthy sentence would neither deter nor rehabilitate, undermining the
       goals of federal sentencing………………………………………………….14

VI.    Edwin is not a Career Offender……………………………………………..16

VII.   Conclusion…………………………………………………………………..18

Defendant Edwin Acevedo Jr. ("Edwin") respectfully submits this sentencing memorandum in support of his request for a sentence of thirty-seven months incarceration, with twelve months of participation in a residential drug rehabilitation program as a special condition of supervised release.

**I.   Introduction**

The federal sentencing statute provides that "[t]he court shall impose a sentence sufficient, but not greater than necessary" to satisfy the statutory goals of sentencing. 18 U.S.C. § 3553(a).

Edwin is the first to acknowledge that he committed a serious crime deserving of significant punishment. But a just sentence must also take into account the factors underlying his criminal conduct. Edwin's crimes are the direct result of severe, nearly life-long drug addiction. A thirty-seven month sentence with a special requirement to complete twelve months of residential drug rehabilitation is considerable punishment for a drug crime borne of Edwin's extreme addiction. *See generally United States v. Bannister*, 786 F. Supp. 2d 617, 674 (E.D.N.Y. 2011) (imposing five-year mandatory minimum, but finding it "excessive" and explaining that "a five-year sentence serves only to diminish his potential for rehabilitation.").

Edwin accepts full responsibility for his actions. He is keenly aware of the harm caused by the drugs he sold. His parents were both intravenous drug addicts who could not care for or protect him and left Edwin to fend for himself at a young age. He sees their faces in some of the people who come by the drug spot he worked at while participating in the offense conduct. Edwin felt deep shame and guilt about selling drugs. But he didn't feel like he had a choice. By the time of his arrest he had developed a nearly $600 a day heroin habit. He used nearly all of the

money he made selling drugs to feed his own addiction, putting aside only a small amount to sublet a bedroom from another addict, and to pay for food.

Edwin was cast aside at 12 years old, left to live in parks and on rooftops by absent and abusive parents. He started using cocaine, and then heroin and has been addicted since he was a teenager. He has spent his entire adult life trapped by the economics of an insurmountable drug addiction. This reality is evidenced by his lengthy rap sheet. He served three years in state prison when he was 19 years old, and has been in and out of state jails and prisons in the ensuing years, mostly for drug possession. The government argues argues that he is a career offender. As detailed below (and agreed to by the probation department) the government is wrong on the law. But more importantly, he doesn't fit the profile associated with that label, having never profited from his crimes; a more apt label would be "career addict."

Edwin engaged in the offense conduct for the same reason he engaged in his prior offenses: because he suffers from substance abuse disorder, as well as other mental health issues, and lacks the resources to to obtain appropriate treatment. Time after time the New York State court system sent him to short-term rehabilitation facilities where drugs flowed freely and meaningful rehabilitation was absent. The thirteen months that he has been incarcerated on this case has been his longest period of sobriety since he was a child. Despite rampant availability of heroin in the MDC he has chosen to abstain, a fact corroborated by the regular drug testing during his incarceration.

During these past thirteen months of incarceration Edwin has kept in contact with his sister, Margarita Santiago, and his eighteen year old daughter, Karisma Acevedo, who is in her first year at Duchess Community College. Both are among a small group of friends and relatives

who have written letters to the Court. Ex. A, Letters of Support. Margarita writes, "He sounds different than other times he's been locked up. He knows this is his last chance to save his life. He is not a bad person with a bad heart but he is an addict who needs treatment. Please help him get into a long term treatment program, far away from the Bronx." Ex. A, Letter of Margarita Santiago. Indeed, once transitioned to supervised release, Edwin intends to move to Florida, where his childhood friend Jose Fonseco offers to help him get started, with a place to live and a job at a construction company. Ex. A, Letter of Jose Fonseco.

The Sentencing Guidelines place Edwin at level 21, criminal history category VI, with an advisory sentence range of 77 to 96 months. The Probation Department recommends a sentence of 72 months, citing past recidivism. But such a harsh sentence would run counter to the goals of federal sentencing, and is inconsistent with research demonstrating that lengthy prison sentences for crimes motivated by drug addiction accomplish neither correction nor rehabilitation. It also would unfairly punish Edwin for circumstances beyond his control: unlike drug sellers who are motivated by greed, Edwin was an addict. When he re-offended it was not because of an obstinate attitude towards authority, but because he felt that he had no better choice. In this way, criminal history category VI, which is reserved for the most recalcitrant repeat offenders, is unfairly applied. Defense counsel's suggested sentence of 37 months is derived from application of the sentencing table, at level 21, without reference to the criminal history axis.

Edwin has the capacity to change. He left school in 5th grade, learning to read and write in jail. Nonetheless, he displays natural intelligence. He is able to grasp complicated legal concepts. Most importantly, he has demonstrated remarkable insight into his actions. During meetings with defense counsel and during the interview for the presentence report ("PSR") he

expressed a strong motivation to seek and participate in treatment for substance abuse disorder. At 47 years old, Edwin is an old man for a street drug addict. He recognizes that his arrest in this case may have saved his life, and is grateful for the limited amount of counseling he receives at the MDC. He feels intense shame for continuing to engage in destructive behavior that harms his community and alienates his family members.

Edwin is a good person suffering from a terrible disease. But-for this addiction, there is no reason to suspect that he would be committing crimes. Long prison sentences do not effectively deter crimes driven by addiction. But there remains a meaningful role for the Court: By requiring long term drug treatment as a condition of supervised release a criminal sentence can be used to motivate and support a defendant like Edwin. While his New York State criminal records indicate several placements in rehabilitation facilities, these were mostly short term programs where use was rampant, and Edwin left or relapsed each time. But past failure does not rule out future success, and it is too early to give up on Edwin.

Edwin asks for an opportunity to restart his life. A 37 month sentence, accounting for the hard time that Edwin has already endured during his last year at the MDC, with 12 months of participation in a residential drug rehabilitation program required as a special condition of his supervised release, would be "just punishment" that is "sufficient, but not greater than necessary." 18 U.S.C. § 3553(a).

## II. Edwin sold drugs to feed his disease, not to profit from the illicit economy.

The first statutory factor that the Court is instructed to consider includes "the history and characteristics of the defendant." *United States v. Slater,* No. 04-CR-48-036 (JSR), 2012 WL 6808470, at *1 (S.D.N.Y. Dec. 28, 2012) (quoting 18 U.S.C. § 3553(a)(1)). "The Guidelines virtually ignore this measure of the man, but here as elsewhere, the Guidelines must take second place to section 3553(a), which requires a court to take account of a defendant's character in imposing sentence." *United States v. Gupta*, 904 F. Supp. 2d 349, 354 (S.D.N.Y. 2012). The abuse and abandonment that Edwin suffered as a child, his early exposure to hard drugs, his subsequent fall into life-long heroin addiction, and his efforts towards rehabilitation all strongly support a sentence far below the applicable Guidelines range.

### A. Edwin was born an opioid addict.

*"I had to be detoxed off dope when I was born because my mom couldn't stop. I think that's why the [stuff] hit my body so hard when I first took it."*[1]

Edwin's parents were heroin and crack addicts with a volatile relationship. Despite his addiction, Edwin Sr. worked and paid the rent on the family apartment on Fairmount Avenue in the Bronx. His mother, Mercedes, stayed at home with Edwin and his sisters, but often left them alone while she went to buy and use drugs. Edwin's sister, Margarita, describes their childhood in a letter to the Court: "We were raised in a household of complete chaos and lack of love or even real supervision. We were very poor and at times couldn't afford food." Ex. A, Letter of Margarita Santiago. As a young child Edwin watched his father drinking and using drugs, and

---

[1] Unattributed quotations in this Memorandum are from Counsel's interviews of the defendant during meetings over several months at the Metropolitan Detention Center during which contemporaneous notes were taken.

was even given beer to drink. Id. He witnessed his father doing drugs so often that he began to imitate him at school by cutting up erasers and sniffing the pieces as if they were drugs. Id. He always had problems concentrating and sitting still. Id.

When Edwin was about six years old he was left alone with his sisters while their mother went out to buy drugs. The kids found some matches and lit a doll's hair on fire. They panicked, threw the flaming doll onto a bed and the apartment was engulfed in flames. Margarita writes, "If it hadn't been for my grandfather who was outside and saw the flames, broke in and got us we probably would have died that day." Id. While the children thankfully survived, the fire presaged the death of the family unit and the premature end of Edwin's childhood.

When Edwin Sr. came home and learned that the apartment had burned down because of Mercedes' failure to supervise the children, he "lost his composure and found Mom and put his hands on her." Mercedes reported this to her brothers and they came looking for Edwin Sr., confronting him with a knife. Recalling that day, Edwin says, "Pops ended up shooting her brother in front of me." This act of violence led to the disintegration of the family and the beginning of Edwin's abandonment to the streets. Edwin Sr. went to prison and the kids were split up into different households. Edwin went to go live with his mother and her sisters on Fordham Road in the Bronx and his sisters moved in with his paternal grandmother in Yonkers.

B. **Edwin was abused and neglected by his parents and guardians; he was never provided with the tools to overcome this trauma.**

*"My brother has seen and been through a lot in his life and because of what I consider to be a sickness that was not only genetically inherited but also somewhat forced on him and taught to him as way to cope with life."* (Ex. A, Letter of Margarita Santiago)



Edwin enrolled in fifth grade in Yonkers. Reflecting on that time, Edwin recalls, "They put me in special ed. It didn't work. I was already messed up mentally. I had this anger inside of me and I took that out on people at school. Being raised by my parents doing drugs, I never wanted to go home. I felt like I belonged on the street." Despite her good intentions, Edwin's grandmother was not able to exert control over him. At twelve years old Edwin ran away from her house and returned to the building where his family used to live. He slept on the roof and subsisted on handouts from people he knew in the neighborhood and from the building's trash. The only adult presence in his life at this point was a man named Robert, an old friend of his father who shared Edwin Sr's heroin addiction. Robert "looked out" for Edwin and occasionally gave him someplace to sleep and wash up. Edwin never returned to school, spending his time on

the block he grew up on in the Bronx, and in the housing projects in Yonkers where his grandmother lived.

Asked for his best memories of childhood, Edwin shakes his head, replies "nothing" and flips the question around: "I can tell you what I didn't like. I never got a chance to feel what it's like to be loved by parents. The absence of love between a child and a parent. That be messing me up. I want to do better for my kids." Edwin's grandmother, he says, "showed [him] love, but she had twelve kids of her own. She was already getting old and broke down. She couldn't keep up."

When Edwin Sr. came home from prison, he found twelve year-old Edwin living on the roof and selling cocaine with the older kids on the block. Having learned during his incarceration that both he and Edwin's mother were infected with HIV, which they attributed to sharing hypodermic needles, Edwin Sr. came home intending to regain his health. He tried to have a role in his son's life, but it was too late. "When he came out he tried to be better" recalls Edwin. "It didn't matter though because I was already damaged."

Edwin moved back in with his father and the abuse returned. His father "was there physically but never mentally or emotionally because as he was always high. [Edwin] would see him sitting there completely incoherent." Ex. A, Letter of Margarita Santiago. Frustrated by his inability to control his son, Edwin Sr. would handcuff Edwin to beds and radiators to lock him in the house. "But being stuck in the house wasn't better and didn't give him the help he needed" writes Margarita. Id. In fact, it made things worse. Edwin became even more angry and rebellious. "He wanted to keep me from the street. That's why he started handcuffing me," he recalls. "It didn't help. I broke out."

Edwin went back to sleeping on rooftops and in parks, returning to the apartment only occasionally. He sold cocaine on the block and snorted the proceeds. Eventually Edwin's father put a "PINS" petition on him. When he was about 13 years old he was sent to the first of many group homes and juvenile facilities. He describes the experience as "like jail, you had to fight to prevent being raped." He was subjected to solitary confinement and forcible restraint, which was used as a "time out" area. One night a roommate set another on fire as he slept. Edwin feared for his life. He left, walking the Metro-North tracks at night until he was back in the Bronx, sleeping on rooftops and using cocaine. Over the next several years Edwin was in and out of juvenile facilities. He was "pushed through the system" and never given an opportunity to get better. Ex. A, Letter of Margarita Santiago. Each time, he returned to the streets where he grew up, with little or no support from adults. His sister writes, "When he tried to turn to our mother for help he was always rejected and or kicked out being forced to live on the streets. I have known my brother to live in the most sad and disgusting places from roof tops to abandoned homes with no heat, no water and no food." Id.

### C. Edwin became addicted to heroin when he was incarcerated at Rikers Island at seventeen years old and has remained addicted his entire adult life.

*"When I started messing with dope, everything was a wrap after that. I haven't stopped since. It's the biggest mistake I ever made."*

At 17, Edwin graduated from juvenile facilities to adult jail. His cocaine use had continued for almost a half-decade. He had burned a hole through the lining of his nose due to the chemicals used to cut the drug, which he was paying for by selling on the street. In 1993 he

was arrested for selling cocaine to an undercover officer and was sentenced to nine months on Rikers Island. While incarcerated he sniffed heroin for the first time.

Edwin kept using heroin for the next 29 years, interrupted only by jail sentences and short stints in court mandated rehabs. Edwin has always sniffed, rather than injected heroin, which is very rare for people who suffer from his level of addiction. He attributes this to fear of needles stemming from his parents' infection from HIV. Sniffing heroin is less efficient, and requires substantially more of the drug than when injected; Edwin developed a $600 per day habit, sniffing nearly 60 bags each day. He always financed his habit by selling drugs, which by his moral calculus was preferable to theft. His lengthy rep sheet is consistent with this activity: arrest after arrest for sale or possession of cocaine or heroin in Yonkers and the Bronx. Between 1993 and 2015 he was sentenced to jail or prison nine times for using or selling drugs, usually in the vicinity of the Fairmount Avenue building where he grew up and later lived on the roof.

During the time period addressed in the Indictment, Edwin was living just a few blocks from Fairmount, on Bellmont Avenue, in a room he rented from another addict. He worked along with his co-defendants selling cocaine and "dope" on the street. PSR § 14. While the conspiracy operated from May 2020 through the date of arrest, Edwin was first involved in September 2021. PSR § 16. Edwin's role was to sit outside of the bodega on the corner of Belmont Avenue and East Tremont Avenue. Edwin was not a swaggering drug dealer. In video surveillance from the case file he appears in his wheelchair, a diminished figure, nearly two decades older than his co-defendants, serving other addicted customers who approached looking for heroin or cocaine. Any money he took in was spent on his daily drug tab.

Edwin knew that what he was doing was wrong. He knew that he was feeding into the same cycle that deprived him of a childhood, and that overdose deaths had become common. He knew that fentanyl had become prevalent, but believed that the "dope" he sold - the exact same drugs that he consumed - was heroin. Nonetheless, he prayed each time he sniffed a bag.

He tried to look out for others. During one of his stints on Rikers he received a certification to administer Narcan, an antidote that is sprayed in the nose of someone undergoing an opiate overdose. He stashed Narcan packets in areas where he knew people to use, and administered the drug when he witnessed an ovedose.

Edwin is not a calculating criminal motivated by greed who can be deterred by a lengthy prison sentence; he is a person struggling to overcome and control decades of addiction and mental illness.

## IV. Edwin needs treatment, not incarceration.

*"He has never really been given a chance to get better. The rehabs that he's been sent to over the years are no better than him being on the street. They are short term. He needs long term. And they are in the same neighborhoods where he has been getting drugs his whole life. If the drugs aren't inside they are right outside the door."* (Ex. A, Letter of Margarita Santiago)

\*\*\*

*"Now I'm 45 years old, I've finally changed my life to the better. I work and I pay taxes and I have a strong support system. When Edwin is released he is coming to Florida to live with me and my family. I'm going to have employment for Edwin. Just have a heart please and don't bury Edwin under the jail."* (Ex. A, Letter of Jose Fonseco)

\*\*\*

*"If I don't get this right I'm gonna die; this isn't an option for me. God has given numerous chances. He has kept me here this long for a reason. I'm starting to realize that. When I spoke with my friend who grew up with me he said 'a lot of our friends died and you're still here, it's for a reason. You've got to figure out what it is.'"*

At 47, Edwin has developed the most insight he has ever had into his disorder. He is ready to commit himself to treatment. Recently he spoke of a counselor he met during his last admission at Odyssey House in 2019. She taught him to recognize the changes that years of addiction caused to his brain, and to resist the inevitable feelings of depression that accompany being drug-free. Edwin knows that the path to sobriety will not be pleasant or easy, but he is just as sure that continued use will lead to death, or, at best, extended terms of incarceration.

During previous stints in New York State jails and prisons Edwin bought and used heroin, relying on family members to send money to relatives of inmates and guards who smuggled the drug inside. The same illicit opportunities exist at the MDC, but Edwin has chosen to abstain. He sees this decision as preparation for life outside, remarking, "If I can't stay clean here I can't do it in the streets." He is involved in a program at the jail where he regularly speaks with a counselor, an experience he has found beneficial. He takes every course offered to him, including subjects like entrepreneurship and developing creativity. PSR § 135. He recently completed a course to obtain his commercial driver's license permit. Having previously learned to read and write in jail, he next wants to get his GED.

Edwin has a plan to move forward: "In programs they have a phrase, people, places and things. A big trigger of mine is going straight back to my hood. Everyone there is drugged up. I feel left out and jump back in. I need to get away from the Bronx. Bronx is my trigger. Everyone in the Bronx uses heroin where I'm from." Edwin wants to leave the Bronx for Florida, where his childhood friend, Jose Fonseco, has offered him a place to live with his family, and a job where he can make use of training he received in prison for masonry and floor covering. PSR § 135. He wants to enroll in a long-term residential treatment program, and to become a member of a "sober community."

Edwin's proactive investment in his rehabilitation is also the greatest possible deterrent against further drug-related crimes.  A time served sentence with a special condition of supervised release that he participate in a long term residential drug treatment program, would afford him a real chance to pursue treatment and rebuild his life.  It thus strikes precisely the balance envisioned under the sentencing statute: it is a significant punishment as Edwin has

already served hard time at the MDC for the last year, that accords meaningful weight to Edwin's personal history and characteristics—his tragic childhood and subsequent drug addiction—and maximizes the constructive goals of rehabilitation and deterrence. A time served sentence, with twelve months of participation in a residential drug rehabilitation program required as a special condition of his supervised release, is thus "sufficient but not greater than necessary." 18 U.S.C. § 3553(a).

### V.    A lengthy sentence would neither deter nor rehabilitate, undermining the goals of federal sentencing.

While nothing can overstate the seriousness of the offense conduct in this case — Edwin sold deadly drugs associated with high rates of addiction and death — the lengthy sentence provided by the Guidelines does not properly calibrate "just punishment" that is "sufficient but not greater than necessary" to meet the sentencing statute's goals.

Years of data clarify that lengthy sentences in drug cases accomplish neither "correction [n]or rehabilitation," 18 U.S.C. § 3582(a), and there is scant evidence that they enhance public safety. "Federal prisons now hold more than 215,000 inmates, almost half of whom are in for drug crimes. Many come out more likely to reoffend than they were when they went in, because of the lack of any meaningful rehabilitation programs inside prisons and the formidable obstacles to employment, housing and drug treatment that they face upon release." See "A Rare Opportunity on Criminal Justice," N.Y. Times (Mar. 15, 2014);[2] see also The Pew Charitable

---

[2] Available at: https://www.nytimes.com/2014/03/16/opinion/sunday/a-rare-opportunity-on-criminal-justice.html.

Trusts, "Time Served-The High Cost, Low Return of Longer Prison Terms," at 4 (June 2012)[3] ("For a substantial number of offenders, there is little evidence that keeping them locked up longer prevents additional crime.").[4]

While lawmakers are understandably anxious to address the opioid crisis, there is simply no empirical evidence that tougher prison sentences in line with the Guidelines are an effective means of deterrence in drug cases. *See United States v. Diaz*, No. 11-CR-00821 (JG), 2013 WL 322243, at * 1 (E.D.N.Y. Jan. 2013) ("the Guidelines ranges for drug trafficking offense are not based on empirical data, Commission expertise, or the actual culpability of defendants. If they were, they would be much less severe, and judges would respect them more."). A 2018 study of state drug imprisonment rates conducted by the Pew Charitable Trusts found "no statistically significant relationship" between imprisonment and "drug use, arrests, or overdose deaths." The Pew Charitable Trusts, "More Imprisonment Does Not Reduce State Drug Problems," at 6 (Mar. 2018). Lengthy sentences do not decrease the number of street-level drug traffickers or stem the supply of street-level drugs. *See* German Lopez, "The New War on Drugs," Vox (Sept. 13, 2017) (although drug war was supposed to stem supply and increase prices, "since 1981, the price of

---

[3] Available at: https://www.pewtrusts.org/en/research-and-analysis/reports/2012/06/06/time-served-the-high-cost-low-return-of-longer-prison-terms.

[4] For these reasons, among others, "sentences below the Guidelines range remain the rule rather than the exception for drug trafficking offenses." *United States v. Diaz*, No. 11-CR-00821 (JG), 2013 WL 322243, at * 9 (E.D.N.Y. Jan. 2013); *see also* U.S. Sentencing Commission, Quarterly Sentencing Update, at 17, and Tbl. 10 (3rd Qtr. 2019) (Between Oct. 1, 2018 and June 30, 2019, more than 65% of drug trafficking sentences nationwide were below the advisory guidelines range). Fentanyl sentences are no different. In 2018, more than one-third of fentanyl offenders nationwide received a downward variance from the guidelines; another one-third received substantial assistance or early disposition departures. *See* U.S. Sentencing Commission, Quick Facts Fentanyl Trafficking Offenses, at 2 (2018). Further, approximately half of all fentanyl sentences were less than five years. *See id*.

heroin per pure gram has actually dropped more than 85 percent.").[5] "Simply put, the market responds to the demand for drugs by replacing drug sellers sent to prison with either new recruits or by the increased drug selling of dealers already on the market. As a result, the incapacitation effect found for some other offenses is largely nullified in the case of drug dealing." Id. (internal quotations omitted); see also U.S. Sentencing Commission, "Recidivism Among Federal Drug Trafficking Offenders," at 60-61 ("There was little to no association between the length of a heroin offender's original federal sentence and rate of recidivism").[6]  All the evidence reflects that long sentences do nothing to promote general deterrence in drug offenses.

## VI.     Edwin is not a Career Offender

At the time that the plea agreement in this case was entered into, the law in the Second Circuit was arguably unclear as to whether Edwin's two New York State convictions for criminal sale of a controlled substance in the third degree (NY PL § 220.39), in 2016 and 2021, qualified as prior felony convictions for purposes of the career offender enhancement. USSG §4B1.1. Since that time, the Second Circuit decided *United States v. Gibson*, 55 F.4th 153 (2d. Cir. Dec. 6, 2022), squarely holding that convictions under § 220.39 do not count as predicate offenses for the enhancement because the New York State statute was categorically broader than the federal controlled substances offense at the time of Edwin's convictions. That holding was reaffirmed when the Second Circuit granted panel rehearing, rejecting the government's attempt to limit the scope of the decision. *United States v. Gibson*, No. 20-3049, 2023 U.S. App. LEXIS 3935, at *1

---

[5] Available at: https://www.vox.com/policy-and-politics/2017/9/5/16135848/drug-war-opioid-epidemic.

[6] Available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170221_Recidivism-Drugs.pdf.

(2d Cir. Feb. 21, 2023). The probation department agrees with this analysis, and has modified the presentence report to remove all references to the career offender enhancement. Addendum to presentence report, 3/2/23, Do. No. 105, p. 1.

## VII.     Conclusion

Edwin is remorseful for his criminal conduct and resolved to change his life. He has served hard time at the MDC over the past year and has used that time in the best possible way. The Court should encourage this progress by rejecting the lengthy sentence recommended by the presentence report and instead issuing a sentence that reflects compassion for the circumstances of Edwin's youth and the direct connection between this initial trauma and the offense conduct. A sentence that allows Edwin to transition to supervised release in a long-term residential treatment facility within the immediately foreseeable future will show him that society has not given up on him, while also serving as a reminder that willful violations of the rule of release will result in incarceration. A lengthy sentence in line with the advisory Guideline range would only curtail any meaningful progress towards rehabilitation, prevent Edwin from receiving the intensive professional treatment he can receive outside prison, and frustrate his effort to rebuild his life.

For these reasons, it is respectfully submitted that a 37 month sentence of incarceration, followed by supervised release with a special condition of long-term residential drug treatment would be fair, just, and sufficient but not greater than necessary to accomplish the objectives set forth in 18 U.S.C. § 3553(a).

Dated:  March 10, 2023
        New York, New York

Respectfully submitted,

LAW OFFICE OF EVAN L. LIPTON, P.C.

By:_____
250 West 55th Street, Floor 30
New York, New York 10019
ell@evanliptonlaw.com
*Counsel for Defendant Edwin Acevedo Jr.*